KILPATRICK TOWNSEND & STOCKTON LLP

April E. Isaacson (SBN 180638)
aisaacson@kilpatricktownsend.com
Two Embarcadero Center
Suite 1900
San Francisco CA 94111
(415) 273 8306

Rishi Gupta (SBN 313079)
rgupta@kilpatricktownsend.com
Sarah Y. Kamran (SBN 347617)
skamran@kilpatricktownsend.com
1801 Century Park East
Suite 2300
Los Angeles CA 90067
(310) 777 3733

Mitchell G. Stockwell (*admitted pro hac vice*)
mstockwell@kilpatricktownsend.com
Vaibhav P. Kadaba (*admitted pro hac vice*)
wkadaba@kilpatricktownsend.com
Michael J. Turton (*admitted pro hac vice*)
mturton@kilpatricktownsend.com
Courtney S. Dabbiere (*admitted pro hac vice*)
cdabbiere@kilpatricktownsend.com
Christopher S. Leah (*admitted pro hac vice*)
cleah@kilpatricktownsend.com
1100 Peachtree Street, NE
Suite 2800
Atlanta GA 30309
(404) 815 6500

*Attorneys for Defendants Cox Communications, Inc.;*
*CoxCom, LLC; and Cox Communications California, LLC*

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENTROPIC COMMUNICATIONS, LLC,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>COX COMMUNICATIONS, INC., COXCOM, LLC, AND COX COMMUNICATIONS CALIFORNIA, LLC,<br><br>　　　　　Defendants. | Civil Action No. 2:23-cv-01047-JWH-KES<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF COX'S RULE 12(C) MOTION FOR INVALIDITY UNDER 35 U.S.C. § 101.**<br><br>Hearing Date:　　July 21, 2023<br>Hearing Time:　　9:00 a.m.<br>Courtroom:　　　9D<br>Judge:　　　　Hon. John W. Holcomb<br><br>**DEMAND FOR JURY TRIAL** |

## Table of Contents

I.   INTRODUCTION ......................................................................................... 1

II.   BACKGROUND ........................................................................................... 1

    A.   The L2ME and QoS Manager Proposed Solutions ........................................................................... 2

    B.   The '422 Patent and Representative Claim 1 ....................... 3

    C.   The '213 Patent and Representative Claim 1 ....................... 5

III.   LEGAL STANDARD ................................................................................... 7

    A.   Motion for Judgment on the Pleadings Under Rule 12(c) ................................................................................. 7

    B.   Patent-Ineligibility Under 35 U.S.C. § 101 ...................... 8

        1.   Step One ........................................................................ 9

        2.   Step Two ..................................................................... 10

IV.   ARGUMENT .............................................................................................. 11

    A.   The '422 Patent's Claims Are Patent Ineligible ...................... 11

        1.   Step One ...................................................................... 12

        2.   Step Two ..................................................................... 16

    B.   The '213 Patent's Claims are Patent Ineligible ...................... 19

        1.   Step One ...................................................................... 20

        2.   Step Two ..................................................................... 23

V.   CONCLUSION .......................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
573 U.S. 208 (2014) ..................................................................*passim*

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016) .................................................... 11, 16

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................ 7

*Bilski v. Kappos*,
461 U.S. 593 (2010) ........................................................................ 8

*BlackBerry Ltd. v. Facebook, Inc.*,
487 F. Supp. 3d 870 (C.D. Cal. 2019), *aff'd*, 831 F. App'x 502
(Fed. Cir. 2020) ..................................................................... 11, 18, 24

*ChargePoint, Inc. v. SemaConnect*,
920 F.3d 759 (Fed. Cir. 2019) ...................................................... 10

*Chavez v. United States*,
683 F.3d 1102 (9th Cir. 2012) ........................................................ 7

*Clarilogic, Inc. v. FormFree Holdings Corp.*,
681 F. App'x 950 (Fed. Cir. 2017)............................................... 13, 14

*Content Extraction & Transmission LLC*,
776 F.3d at 1349 .............................................................................. 8

*Dropbox, Inc. v. Synchronoss Techs., Inc.*,
815 F. App'x 529 (Fed. Cir. 2020)................................................. 9

*Elec. Power Grp., LLC v. Alstom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016)...............................................*passim*

*Fleming v. Pickard*,
581 F.3d 922 (9th Cir. 2009) .......................................................... 7

*Free Stream Media Corp. v. Alphonso Inc.*,
996 F.3d 1355 (Fed. Cir. May 11, 2021)............................... 10, 15, 22

*Fuller v. Yentzer,*
    94 U.S. 288 (1876) ........................................................................................ 9

*Gottschalk v. Benson,*
    409 U.S. 63 (1972) ........................................................................................ 8

*Halliburton Oil Well Cementing Co. v. Walker,*
    329 U.S. 1 (1946) .......................................................................................... 9

*HealthTrio, LLC v. Aetna, Inc.,*
    No. 12-cv-03229-REB-MJW, 2015 WL 4005985 (D. Colo. June
    17, 2015) ...................................................................................................... 14

*I/P Engine, Inc. v. AOL Inc.,*
    576 F. App'x 982 (Fed. Cir. 2014) ................................................................ 7

*iLife Techs., Inc. v. Nintendo of Am., Inc.,*
    839 App'x 534 (Fed. Cir. 2021) .................................................................. 14

*Intell. Ventures I LLC v. Cap. One Fin. Corp.,*
    850 F.3d 1332 (Fed. Cir. 2017) .................................................................. 12

*Kinglite Holdings Inc. v. Micro-Star Int'l Co.,*
    No. CV 14-03009-JVS-(PJWx), 2016 WL 4205356 (C.D. Cal. May
    26, 2016) ...................................................................................................... 7

*Lyon v. Chase Bank USA, N.A.,*
    656 F.3d 877 (9th Cir. 2011) ...................................................................... 7

*Maxell, Ltd. v. VIZIO, Inc.,*
    No. CV 21-6758-GW-DFMx, 2023 WL 3431898 (C.D. Cal. Apr.
    19, 2023) ............................................................................................*passim*

*Mayo Collaborative Services v. Prometheus Lab'ys, Inc.,*
    566 U.S. 66 (2012) ...................................................................................... 11

*Mortg. Application Techs., LLC v. Meridianlink, Inc.,*
    No. SA CV 19-0704-DOC, 2020 WL 1000581 (C.D. Cal. Jan. 6,
    2020), *aff'd*, 839 F. App'x 520 (Fed. Cir. 2021) ...................................... 7

*O'Reilly v. Morse,*
    56 U.S. 62 (1853) ........................................................................................ 9

*OpenTV v. Netflix, Inc.*,
  76 F. Supp. 3d 866 (N.D. Cal. Dec. 16, 2014) ................................................. 22

*Parker v. Flook*,
  437 U.S. 584, 594-95 (1978) .................................................................................. 9

*Prism Techs. LLC v. T-Mobile USA, Inc.*,
  696 F. App'x 1014 (Fed. Cir. 2017) ................................................................... 21

*In re Roslin Inst. (Edinburgh)*,
  750 F.3d 1333 (Fed. Cir. 2014) ............................................................................. 7

*SAP Am., Inc. v. InvestPic, LLC*,
  898 F.3d 1161 (Fed. Cir. 2018) ............................................................................. 8

*Secure Mail Sols. LLC v. Universal Wilde, Inc.*,
  169 F. Supp. 3d 1039 (C.D. Cal. 2016), *aff'd sub nom. Secured
  Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905 (Fed. Cir.
  2017) ...................................................................................................................... 7

*Software Rights Archive, LLC v. Facebook, Inc.*,
  485 F. Supp. 3d 1096, No. 12-cv-03970-HSG (N.D. Cal. Sept. 9,
  2020) ............................................................................................................. 17, 23

*Synopsys, Inc. v. Mentor Graphics Corp.*,
  839 F.3d 1138 (Fed. Cir. 2016) ........................................................................... 10

*In re TLI Commc'ns LLC Pat. Litig.*,
  823 F.3d 607 ......................................................................................................... 17

*Trinity Info Media, LLC v. Covalent, Inc.*,
  562 F. Supp. 3d 770 (C.D. Cal. 2021) ............................................................... 21

*W. View Res., LLC v. Audi AG*,
  685 F. App'x 923 (Fed. Cir. 2017) ..................................................................... 14

*Windy City Innovations, LLC v. Facebook, Inc.*,
  411 F. Supp. 3d 886 (N.D. Cal. 2019) ............................................................... 10

*Wolf v. Capstone Photography, Inc.*,
  No. 2:13-CV-09573, 2014 WL 7639820 (C.D. Cal. Oct. 28, 2014) ........ 8, 12, 20

**Statutes**

35 U.S.C. § 101 ................................................................................................. *passim*

## I.     INTRODUCTION

The claims of U.S. Patent Nos. 10,432,422 (the "'422 Patent") and 9,838,213 (the "'213 Patent") are invalid for claiming patent-ineligible subject matter—subject matter similar to what courts have consistently held is nothing more than an abstract idea: communicating and sending data between nodes in a network, and either aggregating that data as in the '422 Patent, or allocating resources for transmissions based on that data as in the '213 Patent.

Entropic's complaint fails to address these shortcomings, conclusorily pleading that the patents are "directed to patent-eligible subject matter pursuant to 35 U.S.C. § 101." Dkt. 1 ¶¶ 330, 364. This is completely deficient because both patents claim abstract ideas without any additional inventive steps. The '422 Patent claims forming an aggregated data traffic list by requesting and receiving information from nodes within a network about scheduled data transmissions. The '213 Patent claims requesting and receiving information from network nodes to verify their availability to provide resources for a data transmission within the network, and if available, allocating resources for the data transmission, but if unavailable, calculating and transmitting the maximum data rate.

The '422 and '213 Patents are prime examples of the types of claims that are patent ineligible—methods for routine communications between conventional nodes in a network, serving only the function of aggregating or analyzing the information contained in those communications. If these claims are allowed to stand, the '422 Patent would preempt the entire field of creating a list of scheduled transmissions in a network and the '213 Patent would preempt the entire field of allocating resources for data transmissions among nodes within a network.

## II.     BACKGROUND

Entropic filed suit against three Cox defendants on February 10, 2023, alleging infringement of twelve patents, including the '422 and '213 Patents. *See* Dkt. 1. The '422 Patent is a continuation of the '213 Patent. Therefore, because the

two patents share the same specification and figures, citations are to the '213 Patent throughout this memorandum for ease of reference.

### A.    The L2ME and QoS Manager Proposed Solutions

The '422 and '213 Patents assert that when multiple devices are connected to a home network, the various applications on that network compete for resources, which can cause a decrease in the quality of service. '213 Patent, 1:32-2:3. Without a system for coordinating the network nodes, the distribution of bandwidth becomes a problem. *Id.* "Various solutions to solve this problem have been proposed," including "high-level network controllers" and "high-level applications that set priority." *Id.* at 2:4-12. These prior art solutions purportedly required computational power and expenses that were not practical or accessible to regular home users. *Id.*

According to the specification—although not recited in the claims—the proposed solution was a Layer 2 Management Entity, through which network nodes communicated to indicate their availability to transmit or receive a guaranteed quality of service, and a QoS manager, which admitted the guaranteed quality of service flows. *Id.* at Abstract, 3:7-9. The specification describes this solution as "relat[ing] in general to . . . a low-level messaging framework in a network." *Id.* at 3:46-48. This "low-level framework may be thought of as an extension to the Media Access Control (MAC) sub-layer or the physical (PHY) network layer and is referred to as a 'Layer 2 messaging framework.'" *Id.* at 3:62-65.

The framework is described "with reference to a Layer 2 Management Entity (L2ME) architecture and messaging protocol for a digital network." *Id.* at 4:21-23. The L2ME architecture and messaging protocol consists of "a coordinated mesh network architecture 100 with multiple network nodes 104, 106, 108, 110 connected to a network 102." *Id.* at 4:31-33. One of the nodes serves as

> a Network Coordinator (NC) that coordinates the communication between the several devices connected to the network. Coordination is achieved by the NC allocating time-slots to network devices during

which the devices may transmit or receive MAC messages, probes, and data.

*Id.* at 4:5-8. The network coordinator node may be "configured with PHY layer 112, MAC sub-layer 113, and an L2ME 116." *Id.* at 4:34-35. "The system also includes a quality of service (QoS) manager 520 connected to a Layer 2 Management Entity (L2ME) 516." *Id.* at 3:5-7.

The Patent describes the L2ME and QoS manager in wholly functional terms, stating that the "L2ME 116 is responsible for executing and managing all L2ME transactions, such as parameterized Quality of Service, between network nodes 104, 106, 108, and 110." *Id.* 4:43-46. "The QoS manager 520 is configured to admit one or more guaranteed quality of service data flows, e.g., a unidirectional traffic stream." *Id.* at 3:7-9. The job of the QoS manager is to enable the ingress node and egress node to handle a new data stream. *Id.* at 17:20-22. Therefore, according to the specification, it is the L2ME and QoS manager that allow nodes to communicate in such a way that allegedly solves the problem of competing for resources within a network without resorting to the prior art solutions of high-level network controllers and applications. Even though the L2ME and QoS manager are described as the alleged inventive concepts, the specification fails to provide anything more than a functional description of each.

## B.    The '422 Patent and Representative Claim 1

Despite the specification's focus on the L2ME and QoS manager, all of the claims in the '422 and '213 Patents recite only generic network nodes — *none of which are equipped with the L2ME nor the QoS manager.* The '422 Patent claims disclose nothing more than a network coordinator node communicating with other nodes in a network to collect and form an aggregated data traffic list. For example, claim 1, the only claim asserted in the Complaint, recites:

1. A communication network comprising:
a requesting node;

a Network Coordinator (NC) node; and

a plurality of requested nodes,

wherein:

the requesting node is operable to, at least, communicate a first message to the NC node requesting a list comprising parameterized quality of service (PQoS) flows of the communication network; and

the NC node is operable to, at least:

receive the first message from the requesting node; and

in response to the received first message:

communicate a second message to each requested node of the plurality of requested nodes, the second message requesting from said each requested node a list identifying PQoS flows for which said each requested node is an ingress node;

receive, from said each requested node a respective third message comprising a list identifying PQoS flows for which said each requested node is an ingress node;

form an aggregated list of PQoS flows comprising each respective list identifying PQoS flows from each received third message; and

communicate a fourth message to at least the requesting node comprising the aggregated list,

wherein the second message specifies a range of PQoS flows being queried.

The QoS manager and an L2ME are not recited in any of the '422 Patent's 20 claims. In addition to claim 1, claims 5 and 12-17 are independent. For purposes of this motion, independent claim 1 is representative of the remaining claims, as all the claims recite the same subject matter, claim the same abstract idea, and similarly lack any additional non-conventional hardware. The only difference between independent claims 1, 5, and 17 is that claim 1 identifies the Network Coordinator (NC) node by name, while claim 5 merely identifies a generic "communication network node . . . comprising: at least one module comprising a processor and memory," and claim 17's preamble states that "program code is executed by one or more processors of a node of a communication network, the node performs a communication method comprising." The "NC node" in claim 1, the

"communication network node" in claim 5, and the "node" in claim 17 all perform the same recited steps. Claims 12-16 recite the same language as claim 5 except the final limitation, which describes information contained in one of the messages between nodes. *See* '412 Patent, cl. 5 ("wherein the second message specifies a range of PQoS flows being queried"); cl. 12 ("wherein the first message specifies a starting index of a logical table of PQoS flows"); cl. 13 ("wherein the first message identifies a maximum number of PQoS flows for said requested list comprising PQoS flows of the communication network"); cl. 14 ("wherein said each respective third message comprises a value of a respective counter that increments on said each respective requested node when a logical table of flow IDs on said each respective requested node changes"); cl. 15 ("wherein said each respective third message comprises a value indicating a respective number of PQoS flows for which said each respective requested node is an ingress node"); cl. 16 ("wherein the first message, second messages, third messages, and fourth message are Layer 2 Management Entity (L2ME) messages").

## C.     The '213 Patent and Representative Claim 1

The '213 Patent claims likewise disclose nothing more than a network coordinator node communicating with other nodes within a network to indicate their availability to transmit or receive the guaranteed quality of service flow and allocate resources for a future transmission or—in situations where there are not enough resources—determine the maximum data rate of transmission available. '213 Patent, Abstract. For example, claim 1 of the '213 Patent recites:

> 1. A communication method implemented in a Network Coordinator (NC) node of a communication network of a premises, the method comprising:
>
> broadcasting to a plurality of nodes of the network, a request for a guaranteed quality of service flow in the network from a source node to at least one egress node, the plurality of nodes of the network to which the NC node broadcasts the request including at least the source node and the at least one egress node;

receiving a first response to the request from the source node, wherein the source node is the point of origin for the purposes of the guaranteed quality of service flow for data to be communicated within the guaranteed quality of service flow, the first response indicating whether the source node has available resources to support the guaranteed quality of service flow;

receiving a second response to the request from the at least one egress node indicating whether the at least one egress node has available resources to support the guaranteed quality of service flow; and

if the source node and the at least one egress node have available resources to support the guaranteed quality of service flow, then allocating resources for the guaranteed quality of service flow;

if the source node and the at least one egress node do not have available resources to support the guaranteed quality of service flow, then:

denying the guaranteed quality of service flow; and

if the guaranteed quality of service flow is denied based on bandwidth-related reasons, then determining a maximum data rate that would have resulted in a successful request for a guaranteed quality of service flow, and transmitting a message comprising information describing the maximum data rate that would have resulted in a successful request for a guaranteed quality of service flow.

Although the specification describes the alleged invention as having a QoS manager and an L2ME, just as in the '422 Patent, the '213 Patent claims lack these components. The '213 Patent recites 24 claims, of which claims 1, 13, and 23 are independent. Entropic only asserts claim 1 in its Complaint which is representative, as all of the claims recite the same subject matter, claim the same abstract idea, and similarly lack any additional non-conventional hardware. The only differences between independent claims 1 and 13 are in the preamble, which specifies that "program code is executed by one or more processors of a Network Coordinator," and the second limitation which specifies that the first response relates to supporting "the guaranteed quality of service flow directly to the at least one egress node." These differences are immaterial for a patent eligibility analysis. Likewise, claim 23 recites a "system" that practices the same method as recited in claim 1.

### III.    LEGAL STANDARD

#### A.    Motion for Judgment on the Pleadings Under Rule 12(c)

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Judgment under this rule is proper when, taking all of the pleaded material facts as true, the moving party is entitled to judgment as a matter of law. *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009); *Lyon v. Chase Bank USA, N.A.*, 656 F.3d 877, 883 (9th Cir. 2011). A Rule 12(c) motion challenges the legal sufficiency of the pleadings, and the standard for judgment under Rule 12(c) is essentially the same as under Rule 12(b)(6). *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012). Like 12(b)(6), judgment is proper when there is: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Addressing the failure to claim statutory subject matter under 35 U.S.C. § 101 is a question of law that may properly be decided at the pleading stage. *In re Roslin Inst. (Edinburgh)*, 750 F.3d 1333, 1335 (Fed. Cir. 2014). Indeed, addressing this issue early in the lawsuit "can spare both litigants and [the] court[] years of needless litigation." *I/P Engine, Inc. v. AOL Inc.*, 576 F. App'x 982, 996 (Fed. Cir. 2014). Therefore, courts may decide patent ineligibility under § 101 through a motion to dismiss or for judgment on the pleadings under 12(c). *Kinglite Holdings Inc. v. Micro-Star Int'l Co.*, No. CV 14-03009-JVS-(PJWx), 2016 WL 4205356, at *1 (C.D. Cal. May 26, 2016); *see also Secure Mail Sols. LLC v. Universal Wilde, Inc.*, 169 F. Supp. 3d 1039, 1045 (C.D. Cal. 2016), *aff'd sub nom. Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905 (Fed. Cir. 2017); *Mortg. Application Techs., LLC v. Meridianlink, Inc.*, No. SA CV 19-0704-DOC (DFMx), 2020 WL 1000581, at *1 (C.D. Cal. Jan. 6, 2020), *aff'd*, 839 F. App'x 520 (Fed. Cir. 2021).

Where "basic character of the claimed subject matter is readily ascertainable from the face of the patent," claim construction is not a prerequisite and ruling at the pleading stage is appropriate. *Wolf v. Capstone Photography, Inc.*, No. 2:13-CV-09573, 2014 WL 7639820, at *6 (C.D. Cal. Oct. 28, 2014), *see also Content Extraction & Transmission LLC*, 776 F.3d at 1349 (affirming decision to grant motion to dismiss based on patent-ineligible subject matter under § 101 without having a claim construction hearing).

### B.  Patent-Ineligibility Under 35 U.S.C. § 101

35 U.S.C. § 101 defines patent-eligible subject matter as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. Patent protection, however, excludes laws of nature, physical phenomena, and abstract ideas. *Bilski v. Kappos*, 461 U.S. 593, 601 (2010). The legal question of patentable subject matter "may be, and frequently has been, resolved on a Rule 12(b)(6) or (c) motion where the undisputed facts, considered under the standards required by that Rule, require a holding of ineligibility under the substantive standards of law." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018).

"[A]bstract intellectual concepts are not patentable as they are the basic tools of scientific and technological work." *Bilski*, 561 U.S. at 653 (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)). Accordingly, claims that claim the building blocks of human ingenuity," and thus "risk disproportionately tying up the use of the underlying ideas," are ineligible. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216-17 (2014).

The Supreme Court has set forth a two-part test for determining whether a patent is ineligible, and thus invalid under § 101: "(1) it is 'directed to' a patent-ineligible concept, *i.e.*, a law of nature, natural phenomenon, or abstract idea, and (2), if so, the particular elements of the claim, considered 'both individually and as an ordered combination,' do not add enough to 'transform the nature of the claim'

into a patent-eligible application.'" *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (quoting *Alice*, 573 U.S. at 217).

### 1.    Step One

The first step of the *Alice* framework is to determine whether the patent claims are "'directed to' a patent-ineligible concept, *i.e.*, a law of nature, natural phenomenon, or abstract idea." *Elec. Power Grp.*, 830 F.3d at 1353. This first step is to "look[] at the 'focus' of the claims, their 'character as a whole.'" *Id.* The Supreme Court made clear that abstract ideas, even if new, are still abstract. *Alice*, 573 U.S. at 217. For instance, in *Parker v. Flook*, the Supreme Court held that a method for updating alarm limits that used a mathematical formula in a catalytic conversion process was a patent-ineligible abstract idea. 437 U.S. 584, 594-95 (1978). In *Electric Power Group*, the Federal Circuit held that "collecting information, analyzing it, and displaying certain results of the collection and analysis" was an abstract idea. *Elec. Power Grp.*, 830 F.3d at 1353. Moreover, "[i]t is well established that transmitting and receiving data is an abstract idea." *Maxell, Ltd. v. VIZIO, Inc.*, No. CV 21-6758-GW-DFMx, 2023 WL 3431898, at *7 (C.D. Cal. Apr. 19, 2023) (citing *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014); *see also Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. App'x 529, 537 (Fed. Cir. 2020) (finding the claims directed to "'[f]ormatting' data, 'tagging' data, 'transmitting' data, and 'retrieving' data" were abstract).

Critically, a patent "will not be sustained if the claim is for a result," because a result, without more, is not an invention. *Fuller v. Yentzer*, 94 U.S. 288, 288 (1876). Rather, an invention "consists in the means or apparatus by which the result is obtained." *Id.* More than a century ago, the Supreme Court invalidated Samuel Morse's claim to "electro-magnetism, however developed" because it would impermissibly grant "the exclusive right to every improvement . . . it matters not by what process or machinery the result is accomplished." *O'Reilly v. Morse*, 56 U.S. 62, 62, 112-113 (1853); *see also Halliburton Oil Well Cementing Co. v. Walker*,

329 U.S. 1, 9 (1946) (invalidating functional claims because they described the invention "in terms of what it will do, rather than in terms of its own physical characteristics."). Therefore, at the patent eligibility phase, "the claim itself 'must identify "how" th[e] functional result is achieved by limiting the claim scope to structures specified at some level of concreteness, in the case of a product claim, or to concrete action, in the case of a method claim.'" *Free Stream Media Corp. v. Alphonso Inc.*, 996 F.3d 1355, 1363 (Fed. Cir. May 11, 2021) (quoting *Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1302 (Fed. Cir. 2020)). Even if the specification sufficiently discloses how the functional result is achieved, if the claims fail to identify the how, then they "nonetheless do not recite an improvement in computer functionality." *Id.* at 1364. Thus, references to concepts in the patent specification that are not recited in the claims are not enough to transform an abstract idea into patent eligible subject matter because "[t]he § 101 inquiry must focus on the language of the Asserted Claims themselves." *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016); *see also Windy City Innovations, LLC v. Facebook, Inc.*, 411 F. Supp. 3d 886, 902 (N.D. Cal. 2019) (finding arguments for inventive concept at step two failed because, "though Windy City cites to portions of the specification in search of an inventive concept, Claim 19 itself does not describe . . . nor does it explain [those concepts]").

"Ultimately, '[t]he § 101 inquiry must focus on the language of the Asserted Claims themselves,' and the specification cannot be used to import details from the specification if those details are not claimed." *ChargePoint, Inc. v. SemaConnect*, 920 F.3d 759, 769 (Fed. Cir. 2019) (quoting *Synopsys*, 839 F.3d at 1149). Even "complex details from the specification cannot save a claim directed to an abstract idea that recites generic computer parts." *Id.*

### 2.    Step Two

The second step of the *Alice* framework is to "search for an 'inventive concept'—i.e., an element or combination of elements that is 'sufficient to ensure

that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.'" *Alice*, 573 U.S. at 217-18 (quoting *Mayo Collaborative Services v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 73 (2012)). It is fundamental that for this inquiry, the court must look at the invention recited in the claims, rather than the additional details provided in the specification. *Id.* The claim must include additional features to ensure that it is more than a drafting effort designed to monopolize the abstract idea. *Id.* Therefore, "[s]tating an abstract idea while adding the words 'apply it with a computer' simply combines those two steps, with the same deficient result." *Id.* For a claim reciting an abstract idea to nonetheless be patent-eligible, the claim must incorporate the abstract idea into an unconventional, technological improvement in the "physical realm." *Id.*

Step two of the *Alice* framework must evaluate the claim elements as an ordered combination because "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). Indeed, this district has previously held, "generic steps of receiving, transmitting, and displaying information performed in an order anyone would expect" are not enough to be an inventive concept. *BlackBerry Ltd. v. Facebook, Inc.*, 487 F. Supp. 3d 870, 908 (C.D. Cal. 2019), *aff'd*, 831 F. App'x 502 (Fed. Cir. 2020).

## IV.   ARGUMENT

### A.   The '422 Patent's Claims Are Patent Ineligible

The '422 Patent claims patent ineligible subject matter under § 101. The claims are directed to the abstract idea of forming an aggregated data traffic list by requesting and receiving information from nodes within a network about scheduled data transmissions. Additionally, the claims merely recite the use of generic computer equipment for networking, failing to amount to significantly more than the abstract idea itself.

Claim construction is not necessary at this stage to hold that the '422 Patent claims are patent ineligible.[1] The "basic character" of the claimed subject matter "is readily ascertainable from the face of the patent." *See Wolf*, 2014 WL 7639820, at \*6. The '422 Patent claims recite routine steps—sending and receiving information about scheduled data transmissions, forming an aggregated list of those scheduled transmissions, and then sending that aggregated list; therefore, it is not necessary to construe any terms in the '422 Patent at the pleading stage.

### 1.      Step One

The '422 Patent claims are directed to the abstract idea of forming an aggregated data traffic list by requesting and receiving information from nodes within a network about scheduled data transmissions. As stated above, under step one, the Court must examine the "'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter." *Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 850 F.3d 1332, 1338 (Fed. Cir. 2017) (citation omitted).

Independent claims 1, 5, and 12-17 of the '422 Patent all recite the same basic steps: (1) receiving a first message from a requesting node regarding scheduled data transmissions; (2) sending a second message to requested nodes regarding scheduled data transmissions; (3) receiving responses from the requested nodes regarding scheduled data transmissions; (4) forming an aggregated list regarding the scheduled data transmissions; and (5) sending the list back to the requesting node. In short, the claims recite communicating between network nodes to collect information regarding data transmissions, aggregating the collected information into a list, and sending the list to a node in the network.

The Federal Circuit has repeatedly invalidated claims directed to similar ideas. For example, in *Electric Power Group*, the court held that "[t]hough lengthy

---

[1] Entropic identified no claim construction issues concerning this contemplated motion during the parties' required meet and confer.

and numerous, the claims do not go beyond requiring the collection, analysis, and display of available information in a particular field." *Elec. Power Grp.*, 830 F.3d at 1351. Specifically, those claims recited collecting data ("receiving a plurality of data streams . . ., receiving data from other power system data sources"), analyzing the data ("detecting and analyzing events in real-time from the plurality of data streams"), displaying results of the analysis ("displaying the event analysis results and diagnoses of events . . ., displaying concurrent visualization of measurements"), and "deriving a composite indicator of reliability." *Id.* at 1351-1352. Accordingly, the court found that "we have treated collecting information, including when limited to particular content (which does not change its character as information), as within the realm of abstract ideas" and "merely presenting the results of abstract processes of collecting and analyzing information, without more (such as identifying a particular tool for presentation), is abstract as an ancillary part of such collection and analysis." *Id.* at 1353-54.

The claims in the '422 Patent are analogous to those in *Electric Power Group* and are thus directed to a similar abstract idea. For example, they perform the same steps of collecting data ("communicate a first message to the NC node requesting a list comprising parameterized quality of service (PQoS) flows . . . second message requesting from said each requested node a list identifying PqoS flows . . . third message comprising a list identifying PqoS flows"), analyzing the data ("form an aggregated list of PqoS flows"), and displaying the results ("fourth message to at least the requesting node comprising the aggregated list"). '422 Patent, cl. 1.

Similarly, in *Clarilogic* the court held that "a method for collection, analysis, and generation of information reports, where the claims are not limited to how the collected information is analyzed or reformed, is the height of abstraction." *Clarilogic, Inc. v. FormFree Holdings Corp.*, 681 F. App'x 950, 954 (Fed. Cir. 2017) (non-precedential). Accordingly, the court found claim 1 abstract because it "compris[ed] the steps of receiving a request, electronically collecting financial

data, transforming the data into a desired format, validating the data by 'applying an algorithm engine,' analyzing certain exceptions, and generating a report." *Id.* (citation omitted). The '422 Patent claims, like those in *Clarilogic*, recite an abstract idea consisting of collecting information from other nodes, aggregating the information into a list, and sending the list to a node in the network.

Moreover, the '422 Patent claims do not even recite *analyzing* the data like the claims in *Electric Power Group* and *Clarilogic*, but instead recite merely *aggregating* the data into a list. The absence of the analyzing function, an abstract concept itself, drives these claims even further towards abstractness; courts consistently hold that aggregating data is abstract. *See iLife Techs., Inc. v. Nintendo of Am., Inc.*, 839 App'x 534, 536 (Fed. Cir. 2021) ("We have routinely held that claims directed to gathering and processing data are directed to an abstract idea."); *HealthTrio, LLC v. Aetna, Inc.*, No. 12-cv-03229-REB-MJW, 2015 WL 4005985, at *3 (D. Colo. June 17, 2015), *report and recommendation adopted*, No. 12-cv-03229-REB-MJW, 2015 WL 5675303 (D. Colo. Sept. 28, 2015), *aff'd*, 673 F. App'x 1006 (Fed. Cir. 2017) (finding that "collecting and organizing information into a single record" from various sources is abstract).

Futhermore, "[i]t is well established that transmitting and receiving data is an abstract idea." *Maxell*, 2023 WL 3431898, at *7 (citing *buySAFE*, 765 F.3d at 1355); *see also W. View Res., LLC v. Audi AG*, 685 F. App'x 923 (Fed. Cir. 2017) (non-precedential) (holding that the claims were directed to the abstract idea of "receiving or collecting data queries, analyzing the data query, retrieving and processing the information constituting a response to the initial data query, and generating a visual or audio response to the initial data query"). Therefore, the '422 Patent claims are directed to an abstract idea similar to those that courts have consistently found as patent-ineligible.

In addition to the "focus" of the '422 Patent claims being directed to an abstract idea, the claims also fail to provide enough specificity as to how the recited

steps are performed. In other words, the claims fail to describe how the result of the more efficient network is achieved. At the patent eligibility phase, "the claim itself 'must identify "how" th[e] functional result is achieved by limiting the claim scope to structures specified at some level of concreteness, in the case of a product claim, or to concrete action, in the case of a method claim.'" *Free Stream Media*, 996 F.3d at 1363 (quoting *Am. Axle & Mfg.*, 967 F.3d at 1302). Even if the specification sufficiently discloses how the functional result is achieved, if the claims fail to identify the how, then they "nonetheless do not recite an improvement in computer functionality." *Id.* at 1364.

In the '422 Patent, claim 1 recites the functional results of "communicate" and "receive" messages, however it fails to recite *how* the messages are communicated or received. '422 Patent, claim 1 ("the requesting node is operable to, at least, *communicate* a first message to the NC node," "*communicate* a second message to each requested node," "*receive*, from said each requested node a respective third message," and "*communicate* a fourth message to at least the requesting node."). The specification discloses that an "L2ME 116 is responsible for executing and managing all L2ME transactions, such as parameterized Quality of Service." '213 Patent, 4:44-46. Further, "a quality of service (QoS) manager 520 [is] connected to a Layer 2 Management Entity (L2ME) 516. The QoS manager 520 is configured to admit one or more guaranteed quality of service data flows." *Id.* at 2:66-3:12. Therefore, according to the specification's purely functional description of the L2ME and QoS manager, the L2ME and the QoS manager are responsible for how the nodes communicate in the allegedly novel low-level messaging framework in order to achieve a better management of resources within the network. However, the asserted claims do not include the L2ME or QoS manager.

Entropic may attempt to distinguish Claim 16, which states that the "first message, second messages, third messages, and fourth message are Layer 2 Management Entity (L2ME) messages." However, this still does not address how

the messages are communicated. Indeed, the specification even states that "a node not configured with an L2ME may receive an L2ME message." '213 Patent, 6:54-55. Moreover, Claim 16 fails to recite the presence of a QoS manager.

Additionally, because the '422 Patent claims fail to provide enough specificity about *how* the recited steps are performed, the patent, if held valid, would preempt the simple and abstract idea of forming an aggregated data traffic list by requesting and receiving information about scheduled data transmissions from nodes within a network. For example, the steps described in the claims are not limited to the "low-level messaging framework" with an L2ME and QoS manager that the specification touts as being the improvement over the prior art; therefore, the claims cover the same steps performed over the higher-level layers of a network or over a low-level without an L2ME and QoS manager. '213 Patent, 3:46-65. Indeed, the specification describes prior art solutions as "involving a high-level network controller or having high-level applications." *Id.* at 2:4-6. Additionally, the claims are not limited to a cable network. *See also, id.* at 16:19-12 (the method may be implemented over "a coordinated network including a coaxial network in accordance with the MoCA standards, a mesh network, or a wireless network.").

Therefore, under step one of the *Alice* framework, the '422 Patent claims are directed to an abstract idea as a matter of law. Specifically, the abstract idea of forming an aggregated data traffic list by requesting and receiving information from nodes within a network about scheduled data transmissions.

## 2.     Step Two

At step two of the *Alice* framework, the Court must "scrutinize the claim elements more microscopically" to determine if they "require any nonconventional computer, network, or display components, or even a 'non-conventional and non-generic arrangement of known, conventional pieces.'" *Elec. Power Grp.*, 830 F.3d at 1354-55 (quoting *Bascom Global Internet Servs.*, 827 F.3d at 1349-52). This district has similarly stated that "[i]t is well-settled that mere recitation of concrete,

tangible components is insufficient to confer patent eligibility to an otherwise abstract idea . . . . 'Rather, the components must involve more than performance of well-understood, routine, conventional activities previously known to the industry.'" *Maxell*, 2023 WL 3431898, at \*6 (quoting *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 613).

Here, the '422 Patent claims do not recite any inventive concept. Instead, they describe an abstract process accomplished by generic computer equipment for networking. This generic computer equipment includes nothing more than "nodes" of various names: "requesting node," "Network Coordinator (NC) node," and "requested nodes." These "nodes" are similar to the "communications controller" described as "purely functional and generic" in *Alice*. *Alice*, 573 U.S. at 226. Indeed, the Supreme Court explained that "[n]early every computer will include a 'communications controller' and 'data storage unit' capable of performing the basic calculation, storage, and *transmission* functions required by the method claims." *Id.* (emphasis added). As a result, none of the hardware recited by the system claims "offers a meaningful limitation beyond generally linking 'the use of the [method] to a particular technological environment,' that is, implementation via computers." *Id.* (quoting *Bilski*, 561 U.S. at 610-611); *see also Software Rights Archive, LLC v. Facebook, Inc.*, 485 F. Supp. 3d 1096, 1105, No. 12-cv-03970-HSG, at \*8 (N.D. Cal. Sept. 9, 2020) (granting motion for judgment on the pleadings on § 101 grounds where the "claims fail to detail how to achieve these results from a technological perspective, or to establish that any specific technology is required. They instead provide general detail about collecting and analyzing the information on conventional computers."). Moreover, the claims in the '422 Patent "do not even require a new source or type of information, or new techniques for analyzing it." *See Elec. Power Grp.*, 830 F.3d at 1355. "As a result, they do not require an arguably inventive set of components or methods, such as measurement devices or techniques, that would generate new data." *Id.* In fact, the specification confirms

that "[t]he present disclosed method and apparatus may also be embodied in the form of computer program code" and "implemented on a general-purpose processor." '213 Patent, 38:66-39:6.

As described above in step one, the claims fail to include the allegedly inventive concept of an L2ME and QoS manager, which the specification describes in purely functional terms as part of a node in the network. '213 Patent, 4:44-46 ("L2ME 116 is responsible for executing and managing all L2ME transactions, such as parameterized Quality of Service"); *Id.* at 2:66-3:12 ("a quality of service (QoS) manager 520 [is] connected to a Layer 2 Management Entity (L2ME) 516. The QoS manager 520 is configured to admit one or more guaranteed quality of service data flows"). Despite the specification describing the functions of the L2ME and the QoS manager, the '422 Patent claims are devoid of these alleged aspects of the solution. Even if they had been claimed, they are not, the L2ME and QoS manager suffer the same inadequacies for § 101 purposes as the issued claims because the specification fails to describe any details of how the claimed functions are performed. Therefore, the claims relate to nothing more than an abstract idea performed over a conventional network.

Additionally, the ordered combination of claim elements in the '422 Patent claims does not lend itself to patentability. The communication of information between nodes, the aggregation of that information, and the sending of the aggregated information to a node is not a sufficient combination to reveal an inventive step. Indeed, if a node needed to determine the transmission schedules of other nodes in a network, it is only logical that the request would precede the response. *See BlackBerry Ltd.*, 487 F. Supp. 3d at 908 (holding that the "generic steps of receiving, transmitting, and displaying information performed in an order anyone would expect" is not enough to be an inventive concept.). Even assuming the specification's description of the functions of the L2ME and QoS manager were

to provide a meaningful limitation, which they do not, the claims fail to recite the L2ME or QoS manager. *See Maxell*, 2023 WL 3431898, at *7.

The dependent claims of the '422 Patent also fail to recite any additional limitations that create patent eligible subject matter. For example, claims 2, 6, and 18 merely recite the "communication network is a premises-based communication network." '422 Patent, cls. 2, 6, 18. This does not change the analysis above that the claims recite conventional activities on generic computer equipment. Likewise, claims 3, 8, and 9 limit the contents of the second message to at least specifying a "starting index" in claim 8 and a "starting index and a maximum number" in claims 3 and 9. '422 Patent, cls. 3, 8, 9. These limitations, which relate to the contents of the second message, do nothing to remedy the fact that the claims fail to recite *how* the messages are communicated. Claims 4, 10, 19, and 20 similarly fail to recite how the messages are communicated, and instead merely add a limitation as to the contents of the third message. Claim 7 suffers the same fate, as it merely adds a limitation as to the contents of the first message. Claim 11 recites that the "module is operable to communicate the fourth message to a plurality of nodes." '422 Patent, cl. 11. As with the other dependent claims, claim 11 does not claim details regarding how the nodes communicate. Therefore, the dependent claims of the '422 Patent, like the independent claims, do not recite an inventive concept.

Because the '422 Patent claims are directed to an abstract idea and do not contain anything more to confer an inventive concept, they are invalid under § 101 for being directed to patent ineligible subject matter.

## B.     The '213 Patent's Claims are Patent Ineligible

The '213 Patent claims also recite patent ineligible subject matter under § 101. The claims are directed to the abstract idea of requesting and receiving information from nodes in a network to verify their availability to provide resources for transmission of data within the network, and if available, allocating resources for the data transmission, but if unavailable, calculating and transmitting the

maximum data rate. Additionally, the claims merely recite the use of generic computer equipment for networking, failing to amount to significantly more than the abstract idea itself.

Claim construction is not necessary at this stage to hold that the '213 Patent claims are patent ineligible. The "basic character" of the claimed subject matter of the '213 Patent "is readily ascertainable from the face of the patent." *See Wolf*, 2014 WL 7639820, at *6. The claims describe sending and receiving messages about scheduled data transmissions, analyzing those messages, and relaying the analysis back to the nodes; therefore, construing any of the terms in the '213 Patent claims is not necessary for the purposes of the § 101 analysis.

### 1.    Step One

Independent claims 1, 13, and 23 all recite the general steps of: (1) broadcasting a request for a guaranteed quality of service flow to nodes within a network, i.e., a data transmission; (2) receiving a response from a source node indicating its availability; (3) receiving a response from an egress node indicating its availability; and (4) allocating resources for the data transmission if both nodes have availability, or, if the nodes are unavailable due to bandwidth limitations, determining and transmitting the maximum data rate that would have resulted in successful transmission. The '213 Patent claims essentially contain no more than transmitting and receiving messages regarding bandwidth capacity among network nodes, analyzing those messages, and relaying the analysis back to the nodes.

Just as in the '422 Patent, the '213 Patent claims recite sending and receiving messages and data between network nodes. Where the two differ is in what happens after receiving the responses. While the NC node in the '422 Patent claims aggregates the responses, the NC node in the '213 Patent either (a) allocates resources for the transmission, or (b) declines to allocate resources and transmits a message indicating the data rate that would have resulted in a successful transmission. This difference is trivial, as both are directed to abstract ideas.

The analysis of the '213 Patent claims is analogous to *Electric Power Group*. In *Electric Power Group*, the court found the claims directed to an abstract idea because "[t]he focus of the asserted claims . . . [was] on collecting information, analyzing it, and displaying certain results of the collection and analysis." 830 F.3d at 1353. Like "collecting information" in *Electric Power Group*, the NC node in the '213 Patent claims, collects information about bandwidth availability of other nodes. Then, the NC node analyzes the responses from the other nodes about their availability and either (a) allocates resources for transmissions, or (b) denies transmissions and sends a message indicating the best available data rate. This analysis by the NC node is the same as "analyzing it [] and displaying certain results of the collection and analysis" in *Electric Power Group*.

*Prism Technologies* is also analogous. There, "the asserted claims [we]re directed to an abstract process that includes: (1) receiving identity data from a device with a request for access to resources; (2) confirming the authenticity of the identity data associated with that device; (3) determining whether the device identified is authorized to access the resources requested; and (4) if authorized, permitting access to the requested resources." *Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 F. App'x 1014, 1017 (Fed. Cir. 2017). The '213 Patent claims similarly recite a request for access to resources (*i.e.,* request for a guaranteed quality of service flow), require a confirmation of information (*i.e.,* availability of nodes), determination of authorized access to the resources (*i.e.,* analysis of whether resources needed for the guaranteed quality of service flow are available), and permitting access to the requested resources (*i.e.,* allocating resources for the guaranteed quality of service flow). Therefore, the '213 Patent claims recite an abstract idea, very similar to those that courts have consistently found as patent-ineligible. *See also*, *Trinity Info Media, LLC v. Covalent, Inc.*, 562 F. Supp. 3d 770, 782 (C.D. Cal. 2021) ("the Federal Circuit has found that analyzing and comparing data—such as against a predetermined threshold—is also an abstract idea.");

*OpenTV v. Netflix, Inc.*, 76 F. Supp. 3d 866, at 890, 894 (N.D. Cal. Dec. 16, 2014) (finding claims directed to the abstract idea of "ensuring that the necessary resources are available before commencing a presentation that requires those resources."); *Maxell*, 2023 WL 3431898, at \*7 ("[i]t is well established that transmitting and receiving data is an abstract idea.").

The '213 Patent claims also fail to recite *how* the result of a more efficient network is achieved. *See Free Stream Media*, 996 F.3d at 1363 (quoting *Am. Axle & Mfg.*, 967 F.3d at 1302 ("the claim itself 'must identify "how" th[e] functional result is achieved by limiting the claim scope to structures specified at some level of concreteness.'"). The '213 Patent claims the functional language of "broadcasting" and "receiving" messages, but fail to recite *how* the messages are broadcasted or received. The '213 Patent claims also recite "allocating resources" and "determining a maximum data rate," but fail to recite *how* the resources are allocated or the maximum data rate is determined. As discussed above, according to the specification, the L2ME and the QoS manager are respectively responsible for how the nodes communicate messages and admit flows in the allegedly novel low-level messaging framework, but the '213 Patent claims do not include any mention of the L2ME or QoS manager. Thus, the '213 Patent claims do not even arguably recite an improvement in computer functionality.

If the '213 Patent claims are held valid, they would monopolize the concept of requesting and receiving information from nodes in a network regarding bandwidth available for transmission and, depending on the response, either allocating resources needed for the transmission or transmitting information about the best available data rate. For example, the steps described in the '213 Patent claims are not limited to the "low-level messaging framework" with an L2ME and QoS manager that the specification touts as being the improvement over the prior art, and therefore the claims cover the same steps performed over the higher-level layers of a network or lower-level without an L2ME and QoS manager. '213 Patent,

3:46-65. Indeed, the specification describes prior art solutions as "involving a high-level network controller or having high-level applications." *Id.* at 2:4-6.

Therefore, under step one of the *Alice* framework, the '213 Patent claims are directed to an abstract idea as a matter of law. Specifically, the abstract idea of requesting and receiving information from nodes in a network to verify their availability to provide resources for a data transmission within the network, and if available, allocating resources for the data transmission, but if unavailable, calculating and transmitting the maximum data rate.

### 2.    Step Two

At step two of the *Alice* framework, the '213 Patent claims fail to recite an inventive concept that is "sufficient to remove the claims from the class of subject matter ineligible for patenting." *Elec. Power Grp.*, 830 F.3d at 1354.

The '213 Patent claims do not recite any inventive concept. Instead, they describe an abstract process accomplished by generic computer equipment for networking. For instance, the specification states that "[t]he present disclosed method and apparatus may also be embodied in the form of computer program code" and "implemented on a general-purpose processor." '213 Patent, 38:66-39:6. This generic computer equipment, as specified in the claims, includes nothing more than "nodes" of various names: "Network Coordinator (NC) node," "source node," and "egress node." These "nodes" are similar to the "communications controller" described as "purely functional and generic" in *Alice*. *Alice*, 573 U.S. at 226 ("[n]early every computer will include a 'communications controller' and 'data storage unit' capable of performing the basic calculation, storage, and transmission functions required by the method claims."); *see also Software Rights Archive, LLC v. Facebook, Inc.*, 485 F. Supp. 3d at 1105.

The claims in the '213 Patent are similar to those in *Electric Power Group*, as they "do not even require a new source or type of information, or new techniques for analyzing it." *Elec. Power Grp.*, 830 F.3d at 1355. "As a result, they do not

require an arguably inventive set of components or methods, such as measurement devices or techniques, that would generate new data." *Id.*

As described above in step one, the claims fail to include the allegedly inventive concept of an L2ME and QoS manager. *See* '213 Patent, 4:44-46 ("L2ME 116 is responsible for executing and managing all L2ME transactions, such as parameterized Quality of Service"); *id.* at 2:66-3:12 ("a quality of service (QoS) manager 520 [is] connected to a Layer 2 Management Entity (L2ME) 516. The QoS manager 520 is configured to admit one or more guaranteed quality of service data flows"). Despite the specification describing the functions of the L2ME and the QoS manager, the '213 Patent claims lack these allegedly critical components. Therefore, the claims relate to nothing more than an abstract idea performed over a conventional network.

The ordered combination of claim elements also fails to save the '213 Patent claims from their recitation of an abstract idea. The communication between nodes in order to exchange information, analyze that information, and then determine whether resources are available for a successful transmission is not a sufficient combination to reveal an inventive step. Indeed, if a node needed to transmit a data stream with a minimum effective data rate, checking on data rate availability in advance is the logical order of steps to do so. *See BlackBerry Ltd.*, 487 F. Supp. 3d at 908 (holding that the "generic steps of receiving, transmitting, and displaying information performed in an order anyone would expect" is not enough to be an inventive concept.). Even if the specification's statements about the functions of the L2ME and QoS manager were to provide a meaningful limitation and confer an inventive concept, which they do not, the claims fail to recite the L2ME or QoS manager. *See Maxell*, 2023 WL 3431898, at *7.

The dependent claims of the '213 Patent also fail to recite any additional limitations that create patent eligible subject matter. For example, claims 2, 14, and 24 simply add an additional "Submit message" limitation and limit the location of

the network to "a network of a home." Claims 4 and 22 limit the network to a "coaxial cable-based network," which is simply generic networking equipment. Claims 5-9, and 16-18 merely add limitations related to the content of certain messages. Claims 10 and 19 add an additional message indicating when a flow has been accepted. Claims 11 and 20 further limit claims 10 and 19 with the additional limitation of communicating the maximum data rate when a flow has been denied. Claims 12 and 21 further limit claims 11 and 20 by providing that if the message relays that the flow is admitted, then allocating resources. All of the dependent claims, like the independent claims, contain conventional steps that may be accomplished on generic computer equipment. The specification admits as much. *See* '213 Patent, 38:57-66 ("The present disclosed method and apparatus may also be embodied in the form of computer program code . . ., wherein, when the computer program code is loaded into and executed by a computer, the computer becomes an apparatus for practicing the disclosed method and system."). The dependent claims also fail to provide how the messages are communicated, how the resources are allocated, and how the maximum data rate is determined.

Because the '213 Patent claims are directed to an abstract idea and do not contain anything more to confer an inventive concept, they are invalid under § 101 for being directed to patent ineligible subject matter.

## V.   CONCLUSION

For the reasons stated above, this Court should hold that the claims of the '422 and '213 Patents are invalid under 35 U.S.C. § 101 for claiming patent-ineligible subject matter because both patents claim abstract ideas without adding substantial inventive concepts. Cox therefore requests that its Motion for Judgment on the Pleadings be granted.

1   DATED:  June 16, 2023

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

KILPATRICK TOWNSEND & STOCKTON LLP

By: */s/ April E. Isaacson*

April E. Isaacson (SBN 180638)
aisaacson@kilpatricktownsend.com
Two Embarcadero Center
Suite 1900
San Francisco CA 94111
(415) 273 8306

Rishi Gupta (SBN 313079)
rgupta@kilpatricktownsend.com
Sarah Y. Kamran (SBN 347617)
skamran@kilpatricktownsend.com
1801 Century Park East
Suite 2300
Los Angeles CA 90067
(310) 777 3733

Mitchell G. Stockwell (*pro hac vice*)
mstockwell@kilpatricktownsend.com
Vaibhav P. Kadaba (*pro hac vice*)
wkadaba@kilpatricktownsend.com
Michael J. Turton (*pro hac vice*)
mturton@kilpatricktownsend.com
Courtney S. Dabbiere (pro hac vice)
cdabbiere@kilpatricktownsend.com
Christopher S. Leah (*pro hac vice*)
cleah@kilpatricktownsend.com
1100 Peachtree Street, NE
Suite 2800
Atlanta GA 30309
(404) 815 6500

*Attorneys for Defendants*
*Cox Communications, Inc., CoxCom,*
*LLC, and Cox Communications*
*California, LLC*