Christina Goodrich (SBN 261722)
christina.goodrich@klgates.com
Connor J. Meggs (SBN 336159)
connor.meggs@klgates.com
**K&L GATES LLP**
10100 Santa Monica Boulevard
Eighth Floor
Los Angeles, California 90067
Telephone: +1 310 552 5000

James A. Shimota (*admitted pro hac vice*)
jim.shimota@klgates.com
**K&L GATES LLP**
70 W. Madison Street
Suite 3300
Chicago, Illinois 60602
Telephone: +1 312 807 4299

Darlene F. Ghavimi (*admitted pro hac vice*)
darlene.ghavimi@klgates.com
**K&L GATES LLP**
2801 Via Fortuna
Suite #650
Austin, Texas 78746

***Attorneys for Plaintiff***
***Entropic Communications, LLC***

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENTROPIC COMMUNICATIONS, LLC,<br><br>           Plaintiff,<br><br>    v.<br><br>COX COMMUNICATIONS, INC., *et al*.,<br><br>         Defendants. | Case No.: 2:23-cv-01047-JWH-KES<br><br>**PLAINTIFF ENTROPIC COMMUNICATIONS' OPPOSITION TO DEFENDANTS' RULE 12(c) MOTION TO DISMISS FOR INVALIDITY UNDER 35 U.S.C. § 101**<br><br>Hearing Date:  July 21, 2023<br>Hearing Time:  9:00 a.m.<br>Courtroom:     9D<br>Judge:          Hon. J. W. Holcomb |

**PLF'S OPP. TO DEF'S RULE 12(c) MOTION FOR INVALIDITY UNDER 35 U.S.C. § 101**

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION.................................................................................1

II.    THE LAW OF PATENT ELIGIBILITY ...........................................2

III.   THE PATENTS AND THE INTRINSIC RECORD .........................3

  A.   The Problems Solved by the Inventions of the Patents.................3

  B.   The Patents and Claims .................................................................6

    1.   The Patents ...........................................................................6

    2.   The Claims ............................................................................6

    3.   Intrinsic Record of the Patents.............................................8

  C.   Claim Construction.......................................................................13

IV.   THE '213 AND '422 PATENTS ARE VALID..................................14

  A.   The Claimed Subject Matter is not Generic or Routine ...............14

  B.   The Impact of Claim Construction on Patent Eligibility .............15

V.    CONCLUSION....................................................................................16

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
    882 F.3d 1121 (Fed. Cir. 2018) ................................................................ 3, 15, 16

*AIP Acquisition LLC v. Cisco Systems, Inc.*,
    714 Fed. Appx. 1010 (Fed. Cir. 2017) ......................................................... 14

*Bancorp Services, L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*,
    687 F.3d 1266 (Fed. Cir. 2012) ........................................................................ 2

*Berkheimer v. HP Inc.*,
    881 F.3d 1360 (Fed. Cir. 2018) ........................................................................ 3

*Entropic Communications, LLC v. DISH Network Corp.*,
    2:23-cv-01043, Order (C.D. Cal. June 6, 2023) [ECF No. 66] ................. *passim*

*Illumina, Inc. v. Ariosa Diagnostics, Inc.*,
    967 F.3d 1319 (Fed. Cir. 2020) ........................................................................ 2

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
    837 F.3d 1299 (Fed. Cir. 2016) ........................................................................ 2

*Virtual Immersion Technologies LLC v. Safran S.A.*,
    22-cv-1248, Order (C.D. Cal. June 5, 2023) ............................................ 15, 16

*Weisner v. Google LLC*,
    51 F.4th 1073 (Fed. Cir. 2022) ................................................................ 2, 3, 15

*Wonderland Nurserygoods Co., Ltd. v. Baby Trend, Inc.*,
    5:14-cv-01153, 2020 WL 13680678 (C.D. Cal. Dec. 30, 2020)
    (Holcomb, J.) .................................................................................................... 3

**Statutes**

35 U.S.C. § 101 ...................................................................................... 1, 2, 3, 13

**Other Authorities**

Federal Rule of Civil Procedure 12(c) ................................................................ 1

Federal Rule of Civil Procedure 12(b)(6).............................................................3, 13

1  **I.      INTRODUCTION**

2         Defendants (collectively "Cox") have moved for judgement on the pleadings

3  pursuant to Federal Rule of Civil Procedure 12(c) for Invalidity of U.S. Patent Nos.

4  9,838,213 ("the '213 Patent") and 10,432,422 ("the '422 Patent") (collectively "the

5  Patents") —based upon purported patent ineligibility under 35 U.S.C. § 101. Far

6  from representing mere sending and receiving of messages, as Cox represents, these

7  patents claim concrete technological solutions to a very significant problem, *i.e.,* a

8  Layer 2 peer entity administering and controlling quality of service ("QoS") for data

9  flows, using a highly specific messaging protocol.

10        The claims of the Patents require aspects of the disclosed specific messages

11 and protocols of this architecture, between nodes of the network to manage and

12 provide quality of service ("QoS") communication flows. For example, the protocols

13 claimed by the '213 Patent involve a Network Coordinator node handling

14 communication concerning QoS requirements and capabilities among its peer nodes,

15 where certain actions are taken if requested flows are not available. '213 Patent, claim

16 1. The continuation (the '422 Patent) claims, in the context of the same architecture,

17 particular messages with particular contents, used to establish/manage QoS flows.

18 The establishment and management of QoS for flows among network nodes with

19 particular messaging from the "Layer 2 messaging framework" is not at all generic.

20 The very detailed and substantive file history of the Patents, focusing upon particular

21 functional limitations, is clear evidence of the same. The claims resulted from 11

22 Office Actions, 4 Requests for Continued Examination, an appeal to the Board

23 supporting the Examiner, and finally specific claim amendments the Examiner

24 accepted as novel and non-obvious.

25        Cox's disingenuous characterization of the Patents as generically sending and

26 receiving messages withstands no scrutiny, and indeed gets worse the more scrutiny

27 is applied. The motion should be denied.

28

## II.     THE LAW OF PATENT ELIGIBILITY

While Cox accurately describes the *Alice* steps one and two analyses for Section 101 patent eligibility, it omits certain key legal precepts regarding patent eligibility.   *See* ECF No. 64-1 at 8-11.  First, Cox has the burden of proof in challenging claims as patent ineligible.  *Illumina, Inc. v. Ariosa Diagnostics, Inc.*, 967 F.3d 1319, 1328 (Fed. Cir. 2020).  In other words, it is not up to Entropic to prove that a claim is patentable.

Secondly, the Federal Circuit has cautioned against oversimplifying a patent's claims when conducting a Section 101 analysis.  *See McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016) ("We have previously cautioned that courts must be careful to avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims." (internal quotation marks omitted)). In that regard, a court may consult a patent's specification to determine whether the claims challenged under Section 101 include an inventive concept that suffices to defeat such a challenge.  *See Weisner v. Google LLC*, 51 F.4th 1073, 1087 (Fed. Cir. 2022).

Thirdly, it is "ordinarily [ ] desirable—and often necessary—to resolve claim construction disputes prior to a Section 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter." *Bancorp Services, L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012).  This Court has summarized the law regarding the claim construction task, in relevant part, as follows:

> Claim terms 'are generally given their ordinary and customary meaning,' which is 'the meaning that the term would have to a person of ordinary skill in the art.' The terms must be read in the context of the entire patent, however. In interpreting a claim, the Court must focus primarily on the intrinsic evidence of record, including the claims themselves, the specification, and, if in evidence, the prosecution

2

1  history.

2  Among the intrinsic evidence, the 'specification is always highly

3  relevant to the claim construction analysis. Usually, it is dispositive; it

4  is the single best guide to the meaning of a disputed term.' 'The

5  specification is, thus, the primary basis for construing the claims.' It is

6  'entirely appropriate for a court, when conducting claim construction, to

7  rely heavily on the written description for guidance as to the meaning of

8  the claims.'

9  *Wonderland Nurserygoods Co., Ltd. v. Baby Trend, Inc.*, 5:14-cv-01153, 2020 WL

10  13680678 at *3 (C.D. Cal. Dec. 30, 2020) (Holcomb, J.) (internal citations omitted).

11  In the context of a Rule 12(b)(6) (or 12(c)) patent eligibility challenge under

12  Section 101, a court should consult the specification, which it "must accept as true at

13  the pleadings stage." *Weisner*, 51 F.4th at 1088. At the pleading stage, the Court

14  must also accept as true any construction proposed by the non-movant plaintiff. *See*

15  *Entropic Communications, LLC v. DISH Network Corp.*, 2:23-cv-01043, Order,

16  (C.D. Cal. June 6, 2023) [ECF No. 66] at 2, *citing Nat. Alternatives Int'l, Inc. v.*

17  *Creative Compounds, LLC*, 918 F.3d 1338, 1343 (Fed. Cir. 2019).

18  Finally, although patent eligibility is a matter of law, it "may contain disputes

19  over underlying facts." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).

20  "Whether the claim elements or the claimed combination are well-understood,

21  routine, [or] conventional is a question of fact." *Aatrix Software, Inc. v. Green Shades*

22  *Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018). As highlighted herein, each of

23  these legal precepts weighs against granting the instant motion.

24  **III.   THE PATENTS AND THE INTRINSIC RECORD**

25  A.   The Problems Solved by the Inventions of the Patents

26  Prior art systems of course addressed quality of service ("QoS") issues. But

27  they did not do so in the context of the type of "full mesh network architecture" that

28  gave birth to the Patents. '213 Patent, col. 1, lines 55-63. Work on this architecture

revealed problems (and also inventive opportunities) compared to prior art approaches employed in more rigid architectures. In the prior art:

> Various solutions to solve this problem have been proposed, usually involving a high-level network coordinator or having high-level applications, setting priority to data packets or data streams within the network.

*Id.*, col. 2, lines 4-7. Thus the first issue of note is the "high-level" at which prior art solutions work. This refers to the ubiquitous OSI model of communication, which views the protocols as a stack of seven interacting layers from applications at the top down to the physical layer. The Patent also observes that these high-level solutions to managing QoS had detrimental aspects:

> Moreover, intelligent network devices require high computational power and are consequently more expensive than they need to be. Finally, complex network devices are impractical for home use, as most consumers do not have the sophistication or experience to configure a computer network.

*Id.*, col. 2, lines 7-12. The Patent thus observes that prior solutions to QoS issues at high-levels of the protocol (where consumers might interact) introduced undesirable complexity for unsophisticated home users and impose higher costs in terms of computational power. *Id.*, col. 2, lines 4-12. In contrast the Patents disclose, *inter alia*, a solution that:

> resolve[s] configuration and cost issues through the implementation of a ***low-level*** digital transport framework that does not require high amounts of computing power. This low-level framework may be thought of as an extension to the Media Access Control (MAC) sub-layer or the physical (PHY) network layer and is referred to as

a "Layer 2 messaging framework."

*Id.*, col. 3, lines 58-65. Instead of QoS communication management sitting at high layers of the communication stack (for example layer 4 or 5 or above), the Patent implements an architecture to handle it all down at layer 2.  Each layer of the OSI stack resides in a different environment with different responsibilities. Accordingly the function and operation of each layer has its own complexities. The physical layer transporting the bits is very different in design, form and function that the application layer on top (where a web browser resides, for example).  By placing management of QoS flows at Layer 2, the inventors needed to create particular management steps and corresponding messaging that works in the environment and requirements of Layer 2. The Patent devotes well over 30 columns of detailed description to disclosing such protocols and messages in great detail. *See e.g.*, *id.*, col. 4, line 59—col. 38, line 53.

As illustrated in the robust prosecution described below, much of the 30 columns of detailed, specific messaging architecture ended up in the claims at issue here.  That is, the claims of the Patents require aspects of the disclosed specific messages and protocols of this framework, between nodes of the network to manage and provide quality of service ("QoS") communication flows. For example, the protocols claimed by the '213 Patent involves a Network Coordinator node handling communication of QoS requirements and capabilities among nodes at Layer 2, where certain actions are taken if requested flows are not available—a maximum data rate that would have been possible is transmitted. '213 Patent, claim 1. The continuation (the '422 Patent) claims, in the context of the same architecture, particular messages with particular contents, used to establish/manage QoS flows. The specific establishment and management of QoS for flows among network nodes with particular messaging and protocol steps in the "Layer 2 messaging framework" recited in the claims is not at all generic.

**PLF'S OPP. TO DEF'S RULE 12(C) MOTION FOR INVALIDITY UNDER 35 U.S.C. § 101**

B.     The Patents and Claims

1.     The Patents

The '213 and '422 Patents are related, and share a single specification. The '422 Patent is a continuation of the '213 Patent. The application that ultimately issued as the '213 Patent was filed on February 6, 2008, claiming priority to seven provisional applications, the earliest filed on February 6, 2007. After ten years of detailed prosecution, the '213 Patent issued on December 5, 2017. Undoubtedly benefitting from the lengthy prosecution history of its parent, the application that ultimately issued as the '422 Patent was filed on December 5, 2017 and issued less than two years later.

2.     The Claims

The following table shows representative claim 1 from each of the Patents:

| '213 Patent Claim 1 | '422 Patent Claim 1 |
| --- | --- |
| A communication method implemented in a Network Coordinator (NC) node of a communication network of a premises, the method comprising: | A communication network comprising: a requesting node; <br><br> a Network Coordinator (NC) node; and |
| broadcasting to a plurality of nodes of the network, a request for a guaranteed quality of service flow in the network from a source node to at least one egress node, the plurality of nodes of the network to which the NC node broadcasts the request including at least the source node and the at least one egress node; | a plurality of requested nodes, wherein: the requesting node is operable to, at least, communicate a first message to the NC node requesting a list comprising parameterized quality of service (PQoS) flows of the communication network; and <br><br> the NC node is operable to, at least: |

| '213 Patent Claim 1 | '422 Patent Claim 1 |
|---|---|
| receiving a first response to the request from the source node, wherein the source node is the point of origin for the purposes of the guaranteed quality of service flow for data to be communicated within the guaranteed quality of service flow, the first response indicating whether the source node has available resources to support the guaranteed quality of service flow; | receive the first message from the requesting node; and<br><br>in response to the received first message:<br><br>communicate a second message to each requested node of the plurality of requested nodes, the second message requesting from said each requested node a list identifying PQoS flows for which said each requested node is an ingress node; |
| receiving a second response to the request from the at least one egress node indicating whether the at least one egress node has available resources to support the guaranteed quality of service flow; and<br>if the source node and the at least one egress node have available resources to support the guaranteed quality of service flow, then allocating resources for the guaranteed quality of service flow;<br><br>if the source node and the at least one egress node do not have available | receive, from said each requested node a respective third message comprising a list identifying PQoS flows for which said each requested node is an ingress node;<br><br>form an aggregated list of PQoS flows comprising each respective list identifying PQoS flows from each received third message; and<br>communicate a fourth message to at least the requesting node comprising |

| '213 Patent Claim 1 | '422 Patent Claim 1 |
|---|---|
| resources to support the guaranteed quality of service flow, then:<br><br>denying the guaranteed quality of service flow; and<br><br>if the guaranteed quality of service flow is denied based on bandwidth-related reasons, then determining a maximum data rate that would have resulted in a successful request for a guaranteed quality of service flow, and transmitting a message comprising information describing the maximum data rate that would have resulted in a successful request for a guaranteed quality of service flow. | the aggregated list,<br><br>wherein the second message specifies a range of PQoS flows being queried. |

### 3. Intrinsic Record of the Patents

To evaluate the claims in their proper context, the full intrinsic record of the Patents must be examined.

#### a. The Patent Specification

As already noted, the Patents (which share a common specification) eschew high-level control and management over QoS flows. Instead, the patent presents a new protocol and messaging architecture for QoS management carried out by Layer 2 messaging. '213 Patent, col. 3, lines 48-65. The patents introduce a new "Layer 2 messaging framework." *Id.*, col. 3, line 65. This framework is applied to the various

nodes of the Network. Figure 1, for example, illustrates the layer 1 (PHY) and layer 2 (MAC) functionality of a NC Node, in the context of a MoCA network. Also shown are the new portions of QoS management framework inside a "Layer 2 Management Entity (L2ME)," (col 4, line 22) where the "L2ME 116 is responsible for executing and managing all L2ME transactions, such as parameterized Quality of Service, between network nodes …" *Id.*, col. 4, lines 44-47.



FIG. 1

Typically this functionality sits in a particular one of the interacting nodes of the network, which is designated as the NC or "Network Coordinator." *Id.*, col. 4, lines 2-5. The L2ME protocol "enables NC node 106 to manage the flow of low-cost audio/video bridging devices … across a home network with multiple Layer 2 Quality of Service segments." *Id.*, col. 4, lines 53-57, *see also* Fig. 1 depicting the functionality in the NC node. The Patent then devotes a great deal of description to laying out details of, for example, the "L2ME Wave Protocol" (col. 4, line 58 - col. 6, line 30), the L2ME Transaction Protocol including submission, request and

response messages (col. 6, line 32-col. 13, line 15) and providing deep overview of the "L2ME Transaction[s]" (col. 13, line 17-col. 15, line 35). All of this description provides deep detail on the Layer 2 messaging and management architecture.

As an example, for parameterized QoS (or PQoS) flows the NC node sits as the coordinator of messaging traffic—all at layer 2—that manages and guarantees a predetermined data rate flow from an ingress node to an egress node. *Id.*, col. 16, lines 2-4. Figure 7 illustrates:



*Id.*, col. 23, lines 11-16.

Based on the dynamic nature of the PQoS flows, the invention of the '213 Patent enables any network node to retrieve a list of PQoS flows in the network. *Id.*, col. 32, line 54-col. 33, line 36. The NC transmits a request message to the other nodes, which informs the range of PQoS flows that are being queried. *Id.* at col. 33, lines 27-31. Each node provides a response that contains a list of the PQoS flows. *Id.* at col. 33, lines 31-44. The NC then informs the entry node of the aggregated list of PQoS from the first wave. *Id.* at col. 34, lines 12-21. Finally, the NC notifies the entry node about the results of the transaction. *Id.*

Again, this series of transactions occurs at the interface of Layer 2 of the network, as opposed to prior art solutions at "high-levels." '213 Patent, col. 2, lines 5-6. These transactions must work with and fit within the specific functionality and capabilities of the MAC layer.  By implementing this architecture, the inventors provided a solution that consumed less computational power and was usable by ordinary consumers, not just IT professionals. *Id.*, col. 3, lines 48-65.

### b.  The Prosecution History

The claims of the '213 and '422 Patents are the result of an intensive and rigorous scrutiny of the inventions by the USPTO. The prosecution history of the first patent in the family—the '213—spans:

- nine Office Actions engendering claim amendments and/or substantive arguments,

- four Requests for Continued Examination,

- one appeal to the Patent Trial and Appeal Board, confirming the Examiner,

- after appeal two Applicant Remarks/Amendments and one Office Action (all post-*Alice*), resulting in the Examiner granting a Notice of Allowance.

The continuation application that resulted in the '422 Patent followed. Having already blazed the trail with the parent prosecution, there was a single Office Action where the Examiner allowed certain dependent claims if rewritten in independent form, representing specific advances over the prior art, narrowly tailored to achieve a quality of service through implementation in the physical layer of a network.

During prosecution of the parent '213 Patent, the examiner cited prior art references allegedly disclosing broadcasting a request for guaranteed quality of service flow from a network coordinator to a plurality of nodes in a network containing at least one source node and one egress node, receiving responses from nodes indicating whether there are resources available to handle the request, and

---

11

allocating those available resources to ensure the quality of service flow requested. *See, e.g.,* U.S. Appl. Ser. No. 12/027,202, Office Action (Dec. 15, 2011) [Ex. A] at 4-5. The claims were ultimately allowed after the applicant further narrowed the claims to include the limitation of "if the guaranteed quality of service flow is denied based on bandwidth-related reasons, then determining a maximum data rate that would have resulted in a successful request for a guaranteed quality of service flow, and transmitting a message comprising information describing the maximum data rate that would have resulted in a successful request for a guaranteed quality of service." U.S. Appl. Ser. No. 12/027,202, Response to Non-Final Office Action (May 3, 2017) [Ex. B] at 2. This resulted in the following portion of the Notice of Allowance:

The following is a statement of reasons for the indication of allowable subject matter:

4.   1, 13, 28 are allowable over the prior art of record since the cited references taken individually or in combination fail to particularly disclose if the source node and the at least one egress node do not have available resources to support the guaranteed quality of service flow, then: denying the guaranteed quality of service flow; and if the guaranteed quality of service flow is denied based on bandwidth-related reasons, then determining a maximum data rate that would have resulted in a successful request for a guaranteed quality of service flow, and transmitting a message comprising information describing the maximum data rate that would have resulted in a successful request for a guaranteed quality of

U.S. Appl. Ser. No. 12/027,202, Notice of Allowance (July 28, 2017) [Ex. C] at 2-3.

After the '213 Patent ran the gauntlet of prosecution, the continuation leading to the '422 Patent was filed and evaluated by the same Examiner. Unsurprisingly given the content of the prior art was now well-known to both sides, it took only a

single Office Action to produce the issued claims. The Examiner in that Action indicated that the dependent claim (and thus the claims dependent therefrom) would be allowable over the prior art "if rewritten in independent form including all of the limitations of the base claim and any intervening claims." U.S. Patent Appl. Ser. No. 15/832,390, Non-Final Office Action (March 7, 2019) [Ex. D] at 9.  The Applicant elected to simply allow those claims to issue and pursue continuation prosecution. The resulting amendments resulted in the Notice of Allowance:

> 5.      30, 34, 46 are allowable over the prior art of record since the cited references taken individually or in combination fail to particularly disclose  ~~wherein the second message specifies a range of PQoS flows being queried.~~

U.S. Patent Appl. Ser. No. 15/832,390, Notice of Allowance (May 24, 2019) [Ex. E] at 7.

Thus, in order to obtain patent claims, the inventors had to recite very specific technical requirements of the messaging architecture of managing QoS flows. Simply, the claims may have begun as relatively generic, but, after the Examiner made things very difficult, the specific message architecture recited by resulting claims was anything but generic.

C.    Claim Construction

As this Court noted in a co-pending case also involving patents directed to various aspects of MoCA, including the Patents, "in view of the presumption of validity and the clear-and-convincing-evidence standard applicable to validity challenges, the Court concludes it would benefit from considering Entropic's proposed constructions before reaching a Rule 12(b)(6) determination on § 101 eligibility." *Entropic Communications, LLC v. DISH Network Corp.*, 2:23-cv-01043, Order, (C.D. Cal. June 6, 2023) [ECF No. 66] at 2. The Court also clarified that it would take such proposed constructions as true in a Rule 12 context. *See id.* Entropic maintains that the same logic pertains here.

Here, Entropic proposes that the limitation Network Coordinator (NC), as recited in claim 1 of the '213 and '422 Patents, be construed to mean "a node that manages and coordinates QoS of service flows by layer 2 messages among peer nodes of the flows." Starting from first principles, the fact that the Network Coordinator is capitalized suggests that the inventors defined the term. *See, e.g., AIP Acquisition LLC v. Cisco Systems, Inc.*, 714 Fed. Appx. 1010, 1014 (Fed. Cir. 2017) (use of a capital letter indicates that the inventor has specifically defined the term and has acted as their own lexicographer for claim construction purposes). The specification confirms that the Network Coordinator is a defined term.  First, the patent makes clear that the claimed invention arose out of a recognition of the disadvantages associated with management of QoS flows at higher layers in the OSI stack.  But, rather than just articulating what was wrong with the higher layer approach, the inventors introduced the "**Layer 2** messaging framework" of the invention, (col. 3, lines 48-65), followed by 30+ columns of detailed description of the layer 2 protocols and messages. *Id.*, col. 4 – col. 38. A description of a specific advance of an invention over the art can and often does supply a definition for a claim element such as Network Coordinator.

Second, as illustrated in Figures 1 and 5, for example, the Network Coordinator is "role" among the peer nodes of the network, and that role is "dynamically assign[ed]." to the role. *Id*., col. 1, lines 57-59. Thus the NC is not a different or unique device—it is just one of the peer nodes, which participates in the network itself, that has been assigned the role of Coordinator. Entropic's construction flows from how the patentee defined the capitalized term Network Coordinator, and should be utilized by the Court for purposes of addressing the present Rule 12 motion.

## IV.   THE '213 AND '422 PATENTS ARE VALID

### A.   The Claimed Subject Matter is not Generic or Routine

The claimed QoS management architecture was not "routine."  Over the course of 10 Office Actions and an appeal, the Examiner confronted the inventors with 8

14

QoS prior art references. After much back-and-forth, the inventors claimed a highly particularized architecture demanded by an exacting Examiner. This specific messages architecture, which takes up element after element in the '213 and '422 Patent claims, is the opposite of abstract. The claimed architecture is narrow and specific. Particular technical limitations prompted the Examiner to allow the claims of each Patent, as detailed *supra* at III.B.3. The Court should stop there.

B.   The Impact of Claim Construction on Patent Eligibility

However, if the Court is inclined to go further, as noted by the Federal Circuit in *Virtual Immersion Technologies LLC v. Safran S.A.*, a factual issue relevant to addressing *Alice* step one is "[w]hether something is well understood, routine, and conventional to a skilled artisan at the time of the patent." *Virtual Immersion Technologies LLC v. Safran S.A.*, 22-cv-1248, Order (C.D. Cal. June 5, 2023) ("*Virtual Immersion Technologies*") at 7, *quoting Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). Here, claims of the Patents[1] require that this specific architecture be managed and coordinated by a node—the Network Coordinator—at Layer 2. The specification accurately reflects that this was an unconventional advance over the art. *See Weisner*, 51 F.4th at 1088 (the specification "must [be] accept[ed] as true at the pleadings stage."). This is inventive over the prior art, which saw network coordination in general performed at a higher level, with all of the attendant disadvantages of such coordination, as discussed previously. The use of an NC at the interface of Layers 1 and 2, and particularly to guarantee quality of service flows in the manner claimed, was not well understood, routine, or conventional, meaning that the claimed inventions are not abstract ideas under *Alice* step one for an additional reason. *See Aatrix Software*, 882 F.3d at 1128.

The Court should find that both the '213 and '422 Patent claims are not abstract. Not only are the claims not abstract, they are also inventive, the inquiry for

---

[1] All claims of the '213 Patent contain an NC, and claims 1-4 and 6 of the '422 Patent contain an NC.

step 2 of *Alice*.  As described above, the massive prosecution history of this patent family at a minimum creates an issue of fact as to whether the specific messaging architecture recited is inventive. *See Aatrix Software,* 882 F.3d at 1130. The inventors overcame a mountain of prior art to make that showing of inventiveness.  Moreover, this Court has recognized that inventions improving upon a physical instrumentality, *e.g.,* computers, pass muster under that step. *Virtual Immersion Technologies* at 8 (citations omitted). Here, implementing the NC at Layer 2 as opposed to higher levels does improve the nodes, communication devices in the network. Those devices require less processing power and are operable by ordinary consumers. In light of these clear improvements, the claims of the Patents provide sufficient inventiveness to satisfy *Alice* step 2, assuming the Court undertakes that inquiry (which it need not).

## V.    CONCLUSION

For the foregoing reasons, the instant motion should be denied in its entirety.

Dated: June 30, 2023

**K&L GATES LLP**

By:  */s/ Christina Goodrich*

Christina Goodrich (SBN 261722)
Connor J. Meggs (SBN 336159)
K&L Gates, LLP
10100 Santa Monica Boulevard,
8th Floor
Los Angeles, CA 90067
Telephone: (310) 552-5000
Facsimile: (310) 552-5001

James A. Shimota (*pro hac vice*)
jim.shimota@klgates.com
70 W. Madison Street
Suite 3300
Chicago, Illinois 60602
Telephone: +1 312 807 4299

Darlene F. Ghavimi (*pro hac vice*)
darlene.ghavimi@klgates.com
2801 Via Fortuna
Suite #650
Austin, Texas 78746

***Attorneys for Plaintiff, Entropic
Communications, LLC***

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiff Entropic Communications, LLC, certifies that this brief contains 4,238 words, which complies with the word limit of L.R. 11-6.1.

*/s/ Christina Goodrich*
Christina Goodrich

PLF'S OPP. TO DEF'S RULE 12(C) MOTION FOR INVALIDITY UNDER 35 U.S.C. § 101